IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM |
| v. | |
| ANWAR AKBAR ADAMS. | Case No. 3:21-cr-00173-IM-5 |
| _____/ | |

Defendant, Anwar Akbar Adams, requests this Court to impose a sentence below the advisory guideline range of 188 to 235 months. PSR ¶62. The base offense level assigned to cases of "actual" methamphetamine, defined as more than 80 percent pure,[1] or "ice," rests on an outdated premise and is not empirically based. To impose a sentence within the advisory range would be to impose a sentence "greater than necessary" to achieve the goals of sentencing. 18 U.S.C. § 3553(a).

I. **Sentences for methamphetamine offenses are longer than those for other controlled substances.**

Those sentenced for methamphetamine offenses receive longer sentences than those convicted of other drug crimes. As explained by Judge Mark Bennet in *United States v. Nawana*, 321 F.Supp.3d 943, 953 (N.D. Iowa 2018), "[t]he average and median length of imprisonment for methamphetamine offenders during fiscal year 2017 were 91 months and 72 months, respectively, higher than for any other drug

---

[1] *See* USSG §2D1.1, Commentary. (n. 8(D)).

and a 30% higher average and a 26.32% higher median than for heroin (70 months and 57 months, respectively)."[2] For powder cocaine, the average was 75 months and 60 months, respectively, and for crack cocaine, 84 months and 66 months respectively. *Id.* at 953, n. 8. Of those convicted of methamphetamine offenses, 55.7 percent had base offense levels of 32 or higher as compared to 33.3 percent of other drug defendants. *Id.* at 953.

> II. **The 10:1 ratio between methamphetamine mixtures and actual methamphetamine fails to consider the current reality of methamphetamine distribution.**

The disparity rests upon the 10:1 ratio between actual methamphetamine (and ice) and those substances containing a mixture that includes methamphetamine. It is a distinction that "does not comport with the reality of how methamphetamine is created, trafficked, and sold today, and creates an arbitrary distinction between defendants that runs contrary to the § 3553(a) factors." *United States v. Rodriguez*, No. 3:17-cr-31, 2019 WL 1508036, *3 (D. Alaska April 5, 2019).

The United States Drug Enforcement Administration, in a document published on-line, "Methamphetamine a Growing Domestic Threat," wrote that in 1995 the purity of methamphetamine averaged 54 percent.[3] In another DEA publication, "2016 National Drug Price and Purity Data (July 2018)" at 3, the agency

---

[2] Judge Bennett obtained the statistical information from the United States Sentencing Commission's 2017 Datafile, Figure J. *Nawana,* 321 F.Supp.3d at 953.
[3] Available at: https://fas.org/irp/agency/doj/dea/product/meth/threat.htm

stated that between January of 2012 and December of 2016, the average purity of methamphetamine increased from 87.9 percent to 94 percent.[4] In 2019, Judge Timothy Burgess, in *Rodriguez,* reported that since 2015, when the drug had been tested for purity, all but one methamphetamine case in the District of Alaska had purity levels that exceeded 80 percent. 2019 WL 1508036 at *4. A survey done in Idaho between 2015 and 2016, "revealed an average purity of 92.6%." *United States v. Hendricks*, 307 F.Supp.3d 1104, 1107 (D. Idaho 2018).

### III.   The 10:1 ratio rests on a flawed premise.

The purity of the drug is built into the methamphetamine guideline as it is for a few other substances. *See* USSG §2D1.1, comment. (n. 27(C)). For most drugs, the Guidelines provide that "unusually high purity may warrant an upward departure." *Id.* The reasoning for the built-in increase for methamphetamine and a departure for other substances is that "[s]ince controlled substances are often distributed and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." *Id.* Judge Lewis Brack, in *United States v. Ibarra-Sandoval*, 265 F.Supp.3d 1249,

---

[4] Available at: https://ndews.umd.edu/sites/ndews.umd.edu/files/dea-2016-national-drug-price-purity-data.pdf. The same research shows that the price of methamphetamine has decreased: "During the 5 year period January 2012 and December 2016, the PPG [price per gram] of methamphetamine decreased 35 percent ($81 to $53)." *Id.*

1255 (D. N.M. 2017), summarized the approach: "The point, then, of increasing a defendant's sentence based on drug purity is to punish defendants who have prominent roles in drug distribution." Because lower purity is a thing of the past, Judge Brack added: "the Commission's assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality." *Id.* The problem, he wrote, is "that the sentencing Guidelines would treat the average individual convicted of a crime involving methamphetamine as a kingpin or leader, even though that simply is not true." *Id. See also United States v. Nawanna*, 321 F.Supp.3d at 951("the justification in the Guidelines themselves for the purity-driven methamphetamine Guidelines is erroneous or, at least, has been erroneous for the last several years.").

The 10:1 ratio is not the product of the Sentencing Commission's usual empirical approach. In 1987, the "Guidelines' Drug Quantity Table did not distinguish between actual/pure methamphetamine and methamphetamine mixtures." *United States v. Pereda*, No. 18-cr-228, 2019 WL 463027, *2 (D. Colo. Feb. 6, 2019). In 1988, Congress established mandatory minimums for methamphetamine using the 10:1 ratio between actual methamphetamine and a mixture containing the substance. *Id.* As was the case with other controlled substances, the Sentencing Commission followed Congress' lead in developing the Guidelines. *See Kimbrough v. United States*, 552 U.S. 85, 96 (2007) ("The

4

Commission did not use this empirical approach in developing the Guidelines for drug-trafficking offenses. Instead, it employed the 1986 Act's weight-driven scheme."). *See also United States v. Diaz*, No. 11-CR-821-2, 2013 WL 32243, *2-*7 (E.D. N.Y. Jan. 28, 2013). "Consequently, the drug offense Guidelines are not a reflection of the Commission's institutional strengths, and a district court has more discretion to vary from the drug offense Guidelines based on policy disagreements than in a case where the applicable guidelines were promulgated pursuant to the Commission's usual empirical approach." *United States v. Ibarra-Sandoval,* 265 F.Supp.3d at 1253.

### IV. Courts have increasingly varied from the guideline for actual methamphetamine.

Many district courts have come to recognize that the guideline for actual methamphetamine or "ice" produces inequitable results. *See United States v. Bean*, No. 18-cr-057-03No. 2019 WL 1003338, *3 (D. N.H. March 1, 2019) ("the methamphetamine guidelines create unwarranted sentencing disparities between methamphetamine offenses and offenses involving other major drugs.); *United States v. Pereda*, No. 18-cr-228, 2019 WL 463027, *4 (D. Colo. Feb. 6, 2019) (concluding that the 10:1 ratio "creates Guideline ranges for actual (and ice) methamphetamine that are excessive and not similar to other Guidelines;" *United States v. Hoover,* No. 4:17-cr-327, 2018 WL 5924500, *3 (D. Idaho Nov. 13, 2018) ("Purity is also a less meaningful proxy for culpability where nearly all

methamphetamine sold is of 90 percent purity or greater."); *United States v. Ferguson*, No. 17-204, 2018 WL 3682509, *4 (D. Minn. Aug. 2, 2018) (finding that the 10:1 ratio "creates a substantial risk of unwarranted sentencing disparity"); *United States v. Harry*, 313 F.Supp.3d 969, 974 (N.D. Iowa 2018) ("I find both (a) drug purity is not an accurate proxy for culpability in light of the fact that nearly all of the methamphetamine cases brought in our district involve high-purity methamphetamine and (b) the 10-to-1 ration established in the Guidelines is not based on empirical evidence."); *United States v. Saldana*, No. 1:17-cr-271-1, 2018 U.S. Dist. LEXIS 110790, *12 (W.D. Mich. July 3, 2018) ("it is . . . an inescapable conclusion that the current methamphetamine guidelines fail to achieve that mandate . . . [of imposing sentences that "are sufficient but not greater than necessary to achieve the goals of just punishment"]).

Mr. Adams recognizes the argument that higher levels of purity represent a greater danger. Nonetheless, it falls short of justifying the lengthy guideline ranges for actual methamphetamine or "ice." Judge Lynn Winmill acknowledged that "logic would suggest that individuals who deal in purer forms of any drug are sometimes more culpable and pose a greater danger to society," and was unwilling to "completely disregard the drug purity testing." *Hoover* at *3. *See also United States v. Ibarra-Sandoval*, 265 F.Supp.3d at 1256 ("the Court will not ignore the drug purity information."). Nonetheless, finding that "the methamphetamine

guidelines produce advisory sentences that fail to achieve [the] § 3553(a) objectives," Judge Winmill announced he would "consider the drug quantity and purity issue as only loosely advisory," and would "routinely consider granting a variance." *Id.* at 4. He explained that his process would "involve calculating both guideline ranges and then determining, based on all the circumstances, what constitutes a reasonable sentence under the facts of the case." *Id.* He predicted that "[t]ypically," the process would "result in a sentence much closer to the guideline range applicable if no testing had been completed." *Id.*

Similarly, in *United States v. Bean*, 2019 WL 1003338 at *7, the court announced it would calculate the guideline range for both actual methamphetamine and a mixture in making its decision. In *United States v. Nawanna*, 321 F.Supp.3d at 957, the court found the appropriate remedy for the disparity was to reduce the range by a third. In *United States v. Saldana*, 2018 U.S. Dist. LEXIS 110790 at *10, the court announced that its "methodology for sentencing in methamphetamine cases will be to treat all methamphetamine quantities as mixtures." In *Ferguson,* where the guideline range was 210-262 months, 2018 WL 3682509 at *3, n. 12, the court imposed a sentence of the mandatory minimum 10 years. *Id.* at 1. In *Harry,* the court imposed a sentence of 280 months when the guideline range was 360 to life. 313 F.Supp.3d at 971.

**V.     A variance is appropriate in Mr. Adams' case.**

The jointly recommended sentence of 120-months is a sentence that both the United States Attorney's Office and the Multnomah County District Attorney's Office have agreed is appropriate under the circumstances. That recommendation has taken into account the relative strengths and weaknesses of the underlying prosecutions, as well as Mr. Adams' role in the offense. The Defense respectfully requests the Court to go along with the joint recommendation and impose the mandatory minimum sentence of 120-months which we submit would be reasonable, fair, and just under the circumstances.

Dated this the 6th day of April, 2023

/s/ **Tyl W. Bakker**_____
Attorney for Anwar Akbar Adams

Case 3:21-cr-00173-IM   Document 311   Filed 04/06/23   Page 9 of 9

9